IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE STARLINK CORN PRODUCTS LIABILITY LITIGATION | MDL No. 1403 |
| This document is applicable to: | |
| AGRA MARKE, INC., Plaintiff, | |
| vs. | No. 03 C 4385 |
| AVENTIS CROPSCIENCE USA LP, and STARLINK Logistics, Inc., Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff AgraMarke, Inc. brought this action against defendants Aventis CropScience USA LP (Aventis) and StarLink Logistics Inc. (SLLI) claiming breach of contract, and promissory estoppel or equitable estoppel. Defendants moved for summary judgment, and on March 15, 2004, the court granted their motion and suggested that plaintiff may have a third party beneficiary claim. Plaintiff then amended its complaint and included a third party beneficiary claim. Defendants now bring a second motion for summary judgment and seek to dismiss the beneficiary claim. For the following reasons, defendants' motion is granted.

## BACKGROUND

Much of the background here has been discussed in our memorandum and order of March 15, 2004(2004 WL 547244; 2004 U.S. Dist. LEXIS 4134 (N.D. Ill. 2004), and in related litigation. *See*, Kramer v. Aventis CropScience USA Holding, Inc., 212 F. Supp. 2d 828, 833-35 (N.D. Ill. 2002). To reprise briefly, Aventis engineered and licensed StarLink corn, a genetically modified corn that produces the protein Cry9C, which protects corn from pests.

But it shares traits with a known human allergen, causing the Environmental Protection Agency to prohibit the use of Cry9C in food produced for human consumption. Nevertheless, Cry9C DNA was detected in taco shells in September 2000, which lead to a widespread recall of corn products and international restrictions on imports of U.S. corn.

During the fallout caused by the discovery of Cry9C DNA, Aventis launched two remedial services known as the StarLink Enhanced Stewardship Program and the Elevator Program, which respectively directed contaminated corn to proper destinations and resolved claims brought by elevators that suffered financial injuries due to contact with contaminated corn. Those programs were incorporated into an agreement (the Agreement) that Aventis and the attorneys general of 17 states entered into on January 22, 2001. The purpose of the Agreement is as follows:

> The States, on behalf of their respective states and on behalf of growers and grain elevators located in their respective states, and Aventis hereby enter into this binding contractual Agreement and hereby agree to the following measures in an effort to mitigate the economic losses suffered by growers and grain elevators located in their states resulting from Aventis' decision to license Cry9C technology in the Untied States.

Aventis and the states supplemented that agreement in June 2001 with a section addressing claims brought by "non-StarLink growers" who suffered financial injuries. The terms of the Agreement remained in full effect after the adoption of the supplemental provisions.

Plaintiff is a non-profit agricultural cooperative that markets Identity Preserved (IP) grains produced by its members. Plaintiff negotiates contracts with buyers of IP grains, and then essentially acts as an agent or intermediary for its members by causing them to fulfill those contracts by producing and transporting the grains to the buyer (Jamvold dep. at 10-11). That arrangement accurately depicts what transpired in this case. In 1999 and 2000, plaintiff entered into purchasing agreements with ConAgra Corn Processing (ConAgra), who agreed

to purchase set amounts of IP grains. Under those agreements plaintiff's members delivered IP corn directly to ConAgra, and ConAgra paid those members directly for the corn. Plaintiff's interest in the transactions was a 25¢ per bushel premium that ConAgra was to pay for each bushel of corn it sold to third parties as non-genetically modified corn. Plaintiff's members delivered the IP corn to ConAgra, who inspected and accepted the corn. ConAgra then processed the IP corn into a corn product, which it then shipped to Meiji Seika Kaisha (Meiji Seika), a Japanese company. Meiji Seika inspected the corn and discovered the presence of Cry9C. Then, on March 19, 2001, Meiji Seika terminated its order with ConAgra. As a result, the corn products were not sold as non-genetically modified and plaintiff did not collect the 25¢ per bushel premium.

Plaintiff submitted a claim in the amount of $946,918.45 to StarLink Logistics Inc. (SLLI), an entity that purchased Aventis CropScience's businesses and assumed control of the Stewardship and Elevator programs. Plaintiff's claim represented the total premium it would have received had the corn been sold as non-genetically modified. After SLLI denied that claim, plaintiff brought this action and raised three grounds for recovery: breach of contract, and, in the alternative, promissory estoppel and equitable estoppel. Proceeding under Kansas law[1] the court dismissed each of those grounds. Plaintiff could not show detrimental reliance on any promise made by defendants because it began selling IP corn to ConAgra in 1999 and the Agreement was not signed until 2001. Plaintiff's failure to show reliance doomed its estoppel claims, and its breach of contract claim failed because it could not show that it had a valid agreement with defendants. The court concluded that defendants' offer to cover claims

---

[1] Kansas law still governs, as it is the best choice of law under Minnesota's choice of law rules. *See* In re StarLink, 2004 WL 547244, *2.

was only an invitation to contract, and that defendants never agreed to cover plaintiff's losses. We did, however, observe that "the purpose of the contract was to mitigate potential losses suffered by grain handlers and elevators," which indicates the possibility of third party beneficiary claims.[2] On April 27, 2004, plaintiff filed an amended complaint, which added a third party beneficiary claim.

Defendants now argue that plaintiff is not a third party beneficiary, as the Agreement expresses no intent to benefit it. Defendants also advance that the claim form submitted by plaintiff was incomplete – it provided sufficient ground to deny plaintiff's claim. Plaintiff contends that it is an intended beneficiary to the Agreement, and that due to its third party beneficiary status, strict compliance with the claims forms was unnecessary.

## DISCUSSION

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, the court views the evidence and draws all reasonable evidences therefrom in the light most favorable to the non-moving party. Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th Cir. 2002). A fact is material if it is essential to the disposition of a claim. Wright ex rel. Trust Co. v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001). And a fact is genuine if the evidence produced by each party would enable the court to "resolve the issue either way."

---

[2] Plaintiff misrepresents the March 15, 2004, order when it states that the court accepted that it was a third party beneficiary. Rather, we only suggested the possibility of third party beneficiary status, and could not conclude that such status existed as the court was presented with neither facts nor argument on that issue.

Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)). *See also* Owens v. Sprint/United Mgmt. Co., 333 F. Supp. 2d 1094, 1098 (D. Kan. 2004). When the evidence in the record shows that no material dispute of fact exists, we will grant a summary judgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The dispositive issue is whether plaintiff is a third party beneficiary that may enforce the Agreement. Before we decide plaintiff's rights to enforce the Agreement, we must find in the Agreement a provision that operates to plaintiff's benefit. State ex rel. Stovall v. Reliance Ins. Co., 91 P.3d 531, 543 (Kan. 2004) (quoting Hartford Fire Ins. Co. v. Western Fire Ins. Co., 597 P.2d 622 (1979)). For third party beneficiary status to exist, "the contract must be made for the third party's benefit as its object, and he must be the party intended to be benefitted in order to be entitled to sue upon it." Stovall, 91 P.3d at 543 (quoting Fasse v. Lower Heating & Air Conditioning, Inc., 736 P.2d 930, 932 (Kan. 1987)). The intent to benefit the third party must be clearly expressed in the contract because Kansas law presumes that contracting parties "act for their own benefit." Tradesmen Int'l v. United States Postal Serv., 234 F. Supp. 2d 1191, 1202 (D. Kan. 2002). *See also*, United States v. United Services Auto. Assen, 968 F.2d 1000, 1001-02 (10th Cir. 1992); Lewis v. Globe Constr. Co., 6 Kan. App. 2d 478, 485 (Kan. Ct. App., 1981). The right of a third party beneficiary to enforce a contract "rests chiefly upon the fact that the contract will create reasonable expectations on his part and will induce him to change his position in reliance." Noller v. GMC Truck & Coach Div., General Motors Corp., 772 P.2d 271, 275 (Kan. 1989) (quoting 4 CORBIN ON CONTRACTS § 775 (1951)).

We apply general rules of contract construction to determine the contracting parties' intent with respect to a third party's rights. United Services Auto. Assen, 968 F.2d at 1002; Rigby v. Clinical Reference Lab., 995 F. Supp. 1217, 1226 (D. Kan. 1998). When the contract

terms are plain and unambiguous, the intent of the parties and the meaning of the contract are determined exclusively from the contract. Rigby, 995 F. Supp. at 1226. It is only when the contract is ambiguous that extrinsic evidence, such as "the facts and circumstances surrounding the execution of the instrument," may be consulted for clarification. *Id.* We turn, then, to the Agreement.

In the paragraph entitled "Purpose of Agreement," which is quoted in sum above, defendants and the states expressed a clear intent to benefit "growers and grain elevators" who suffered financial losses as a result of Aventis' decision to license Cry9C technology. The Agreement specifically covers growers who encountered contaminated corn in a number of settings. For example, growers are covered if they were StarLink growers (section 4(a)(1)) or if they suffered losses related to non-StarLink corn containing Cry9C (section 4(a)(2)).[3] The latter category lists four additional subcategories of growers who are entitled to compensation for StarLink-related losses.[4]

Plaintiff admits that it is neither a grower nor an elevator in its memorandum (plaintiff

---

[3] The Agreement specifically defined who was entitled to recover, as the indented excerpts below illustrate.
StarLink growers and buffer growers who suffered losses due to StarLink corn include:
>  StarLink Growers: growers who grew corn from StarLink hybrids ("StarLink Corn") and grew other corn within 860 feet of StarLink corn ("Buffer Corn") and whose StarLink Corn remains on farm or was on farm as of September 29, 2000, and
>  Buffer Growers: growers who did not grow any corn from StarLink hybrids but who grew another variety of corn (including but not limited to white corn and popcorn) within 660 feet of StarLink Corn ("Buffer Corn") and whose Buffer Corn remains on farm.

For growers who suffered losses due to non-StarLink corn, the eligible class include only:
>  Growers with corn that remains on farm or was on farm as of September 29, 2000 and that tests positive for Cry9C protein or Cry9C DNA but who did not grow from StarLink hybrids and did not grow corn within 660 feet of corn grown from StarLink hybrids.

[4] Category 1 covers non-StarLink growers who grew hybrids and have confirmation that those hybrids contained Cry9C. Category 2 includes growers whose hybrids may have contained Cry9C but lack actual confirmation of contamination from their seed supplier. Category 3 covers growers whose hybrids may have contained Cry9C and whose seed supplier denies Cry9C contamination. Category 4 applies to growers who have no explanation why their grain tests positive for Cry9C. Specific testing requirements and procedures are described for the growers included in Categories 2-4.

mem. 3). The testimony of Daryll Jamvold, chief executive officer of AgraMarke, is consistent with that admission (Jamvold dep. 68). Plaintiff is not an elevator because it does not store corn for its members, unlike other agricultural cooperatives (Jamvold dep. 7, 67-68). Plaintiff is not a grower because it grows no corn; instead, its growers produce the corn.

Plaintiff is an agent acting on behalf of growers, meaning that it facilitates transactions of IP corn by contracting with a buyer of IP corn, and then contracting separately with its grower members and requiring them to produce and deliver IP corn to that buyer (Jamvold dep. 10-11). As mentioned above, this is precisely how ConAgra received the IP corn that eventually became contaminated with Cry9C. Plaintiff agreed to have 5,000,000 bushels of IP corn delivered to ConAgra (*id.* at 17). Then the growers, pursuant to separate production contracts with plaintiff, delivered approximately 3,700,000 bushels of corn directly to ConAgra (*id.*). Prior to accepting the corn, ConAgra tested the corn to ensure it met IP standards, which it did (*id.* at 27). ConAgra paid the growers directly (*id.* at 11). ConAgra then processed the corn and attempted to deliver it to Meiji Seika. Plaintiff never took possession of the corn at any time during the production process (*id.* at 67). Indeed, plaintiff could not have possessed the corn because it lacked storage facilities (*id.* at 8). The corn was stored either at the growers' farms or at facilities owned by ConAgra. Under the Agreement, an elevator was eligible to recover only if it was "documented to have received StarLink corn and/or buffer corn." Further, plaintiff never took title to the corn, as it transferred directly from the growers to ConAgra (*id.* at 32).

Plaintiff's stake in the transaction was the 25¢ premium that it was to receive if ConAgra sold the corn products as non-genetically modified corn to third parties. Section 8(d) of the "Non-GMO Corn Purchase Agreement," which is the contract that plaintiff entered into

with ConAgra on August 8, 2000, clearly required that the premium was due to plaintiff only after ConAgra made "confirmed sales" of non-genetically modified corn products to its customers. In contrast, section 8(c) required ConAgra to pay AgraMarke a "milling premium" of 5¢ per bushel delivered to it by plaintiff's members. Thus, the purchase premium was conditioned on a subsequent sale of non-genetically modified corn and the milling premium was conditioned on delivery to ConAgra. In this lawsuit plaintiff only seeks to recover the purchase premium. It received that premium for 158,997 bushels that ConAgra sold as non-genetically modified corn. But on June 27, 2001, ConAgra notified plaintiff that it was not pursuing any new non-genetically modified sales with respect to the 3,700,000 bushels it had received from plaintiff's growers. It did not pursue such sales because the corn was contaminated and could not be marketed as non-genetically modified. Also relevant is that the corn only became contaminated after it was delivered to ConAgra's processing facility in Atchison, Kansas.[5] Due to StarLink contamination, ConAgra stopped production at that facility on October 16, 2000.

The transactions discussed above fail to indicate that plaintiff was either a grower or an elevator in that it did not grow, deliver or store any of the corn that eventually commingled with Cry9C and could not be marketed as non-genetically modified corn. No provision in the Agreement operates to plaintiff's benefit or gives it enforceable rights. The Agreement intends to benefit growers and elevators who suffered losses as a result of Cry9C, and there

---

[5] In a letter that plaintiff attached to its "Elevator/Grain Handler" claim form it asserted:

Since the Non-GMO Purchased Corn had previously tested negative for StarLink upon delivery to ConAgra, we can only assume that ConAgra commingled the Non-GMO Purchased Corn with corn contaminated with StarLink and then attempted to sell such corn to Meiji Seika, ultimately causing a loss of all sales of the Non-GMO Purchased Corn since Meiji Seika detected StarLink.

is no language that clearly expresses an intent for the defendants to assume a duty to plaintiff. See In re StarLink, 2004 WL 547244, * 2 ("There is no indication that defendants ever agreed to cover plaintiff for any loss"). Similarly, in Stovall the Kansas Supreme Court concluded that the state lacked third party beneficiary status because the contract that it sought to enforce contained no duties that were owed to it. Stovall, 91 P.3d at 544. The Agreement's terms are not ambiguous or vague and there is no need to reference any extrinsic evidence. While caution is required when granting summary judgment if the material issues involve intent (Noller, 772 P.2d at 274), here the intent of the contracting parties is clearly expressed, leaving no dispute of material fact.[6]

Plaintiff claims that the Kansas Cooperative Marketing Act (Kan. Stat. Sec. 17-1601 et seq.) establishes its status as an intended beneficiary. But that statute authorizes plaintiff to act as an agent for growers and to facilitate transactions without taking title to the commodities. Plaintiff's position further illustrates that it is neither grower nor elevator because it shows that plaintiff is statutorily defined as an agent, and the Agreement does not intend to benefit agents. Plaintiff also asserts that it intended to distribute the 25¢ premium among its members, and its loss of the premium harmed those members. It is true that those members, as growers, have a stronger case for recovery under the Agreement. But their recovery is far from certain, as it is not disputed that StarLink contamination occurred after the growers relinquished both possession and title to the corn, and the Agreement stipulates that eligible growers must have corn that tests positive for Cry9C. Regardless of any

---

[6]Plaintiff also urges us to withhold judgment under Fed. R. Civ. P. 56(f). However, plaintiff admits to be neither grower nor elevator, and despite its position that such an admission is a non-issue, we view it to be the crucial issue as the contracting parties clearly created the Agreement to benefit those classes. We can conceive of no facts, particularly related to any settlement between defendants and ConAgra (which is clearly an elevator), that would assist plaintiff in defeating defendants' motion.

hypothetical claims brought by growers – claims that are not before the court now – plaintiff cannot step in and sue as a third party beneficiary to the Agreement.

Defendants also argue that plaintiff failed to comply with the claims procedures when it submitted its "Elevator/Grain Handler" claim form. Plaintiff was unable to supply certain information, such as transportation and storage costs, because it is not an elevator. It also checked "rejection of load by destination" as the method of discovery. However, as defendants correctly identify, ConAgra was the destination for the corn delivered by plaintiff's growers, and it did not reject a delivery. Plaintiff asserts that strict compliance with the claim form was not required due to defendants' representations that they would be flexible and accommodating when processing claims. Even if we accept plaintiff's position, the claim form is inadequate for the fundamental reason that plaintiff is not an elevator. The fact that no claim procedure exists for a party in plaintiff's position further illustrates that plaintiff is not an intended beneficiary and lacks standing to enforce the Agreement. *See* Bodine v. Osage County Rural Water Dist. No. 7, 949 P.2d 1104, 1112-13 (Kan. 1997); Stockman v. Unified Gov't of Wyandotte County, 6 P.3d 900, 909 (Kan. App. Ct. 2000).

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted, and plaintiff's motion to compel discovery is dismissed as moot.

JAMES B. MORAN
Senior Judge, U. S. District Court

Feb. 8, 2005.